UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARIAN WREN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-00026-SEB-DML |
| | ) | |
| CHRYSLER GROUP, LLC, | ) | |
| *et al.* | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on Defendants' separate motions for summary judgment, [Docket No. 66 and Docket No. 71], filed on May 15, 2014 and May 16, 2014 pursuant to Federal Rule of Civil Procedure 56. Plaintiff Marian Wren has sued her employer, Chrysler Group, LLC ("Chrysler" or "the Company") and her Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local 685 ("Union") for alleged acts of race and sex discrimination, racial and sexual harassment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* ("Title VII"). Both Defendants deny having committed any such violations and, apart from the merits of the Complaint, contest the timeliness of her claims. For the reasons outlined in this ruling, we GRANT the motions for summary judgment in their entirety.

## Facts

Ms. Wren, a Caucasian woman, is an employee at Chrysler's Kokomo Transmission Plant whose tenure began on August 15, 1988.[1]   Throughout her employment, she has been a member of and represented by Local 685 of the Union.  Between 2008 and 2011, Ms. Wren was assigned to the first shift in the tool crib. The "tool crib" is a two-story room where company equipment and tools are stored.  The tool crib operates from a front counter from which it fills customers' service requests.  This area also handles shipping, receiving and intake.  Materials and tools and parts are maintained and issued through this department.  Ms. Wren's duties included responsibility for issuance of goods, signing out materials, tools, inserts and machining parts, and taking care of customer service requests.

When Ms. Wren started working in the tool crib, one of her co-workers on the first shift was Tim Clark, an African American male.  Mr. Clark later was transferred to second shift (3:00 p.m. to 11:00 p.m.).  At some point, Ms. Wren was bumped to third shift (11:00 p.m. to 7:00 a.m.).

This litigation arises primarily out of a number of workplace conflicts that occurred between Mr. Clark and Ms. Wren.  In or around early 2010, Ms. Wren observed cigarette ashes in her work area at the tool crib when she reported to work on the third shift.  She suspected that Mr. Clark had been smoking during his second shift and, if so, believed he was in violation of company policy.  Ms. Wren reported her suspicions regarding Mr. Clark to her supervisor, Bob Meguiar, who allegedly told her that unless Mr. Clark was caught in the act of smoking, there was nothing that could be done about it.  Unhappy with that response by Mr. Meguiar, Ms. Wren next reported her suspicions to Mr. Meguiar's supervisor, Shelly Woods.  Ms. Woods was more

<hr/>

[1]  Wren was separated from Chrysler between 1996 and 2005, during which time she filed a sexual harassment lawsuit against Chrysler.  She returned to work pursuant to a settlement agreement with Chrysler which apparently resolved those complaints.

responsive, acknowledging that, if her complaints were true, the no-smoking policy was being violated and his smoking would have to stop. Ms. Woods indicated to Ms. Wren that she would pass along the information to the Company's second shift area manager with the request that he monitor the situation. When Mr. Meguiar later learned that Ms. Wren had lodged her complaint with his supervisor, Ms. Woods, he expressed to Ms. Wren his disappointment that she had gone over his head.

Apparently still not satisfied that her complaint had been properly addressed, Ms. Wren reported Mr. Clark's suspected smoking violation to her union representatives, Local 685 Committeeman Ryan Morgan and Steward Tedman Smith. (Morgan and Smith are both Caucasian.) In response to Ms. Wren's request that Mr. Clark be disciplined for his violation of the smoking ban, Mr. Smith informed her that the responsibility for monitoring and enforcing this no-smoking policy rested with the Company, not the Union. Ms. Wren also complained to the Union Committeeman Morgan, who informed Ms. Wren that enforcing the no-smoking policy was a company responsibility, not the Union's. Mr. Morgan, who as a Union official was responsible for representing both Ms. Wren and Mr. Clark, nonetheless did meet with Mr. Clark about this issue, reminding him that he was to smoke only in designated areas and informing him, without disclosing that Ms. Wren was the complainant, that a complaint had been filed with company management against him alleging that he had violated the policy. Thereafter, Ms. Wren requested no further action by or assistance from the Union or the Company regarding the smoking issue.

At some point, a company supervisor informed Mr. Clark that it was Ms. Wren who had filed the complaint against him.

In early February 2010, Mr. Clark and Ms. Wren had a run-in over Mr. Clark's lunch bag, which was situated on a shelf in his work area when Ms. Wren arrived at work a few minutes before her shift began. She allegedly grabbed hold of the lunch bag and moved it, which upset Mr. Clark, prompting him to tell Ms. Wren that if his "stuff" was in her way, she should let him know and he would move it.

Another more serious incident occurred between Ms. Wren and Mr. Clark approximately one week later, on February 11, 2010. Ms. Wren, who again had reported to work a few minutes prior to the start of her 11:00 PM shift, apparently needed to use a dolly from the tool crib. Mr. Clark, who had not yet finished up his shift, was sitting at his desk. He had hung his jacket on the handles of the nearby dolly, as he often did, to have it available when he wanted to go outside to smoke. Ms. Wren took hold of the jacket to move it, which again angered Mr. Clark, who grabbed it back from her and, speaking harshly vulgar words, told her to keep her hands off his coat. In his anger, Mr. Clark kicked the dolly into some nearby barrels and caused a scene. Mr. Clark contends that when Ms. Wren had picked up his jacket, she threw it on an oily scrap bin and called him a "n****r"—an allegation Ms. Wren denies. Mr. Clark maintains that as he left work at the end of his shift, he observed Ms. Wren talking loudly on her cell phone and complaining about the incident.[2] Later that evening, Ms. Wren telephoned her supervisor at his home to report the confrontation and was instructed to inform Union Steward Tedman Smith.

Ms. Wren filed a complaint with the Union over this incident, and Mr. Clark filed his own separate complaint against Ms. Wren with the company. Mr. Clark's complaint included

---

[2] Another employee, Lisa Fording, was standing at the tool crib window while Ms. Wren was on the phone, and also heard Ms. Wren raise her voice and utter obscenities; according to Ms. Fording, Ms. Wren had a practice of throwing things when she was angry. Another employee, Joseph Jarrett, corroborated Ms. Fording's accounts of Ms. Wren's outbursts. Ms. Wren, however, denies that she engaged in such conduct.

his claim that Ms. Wren had used a racial epithet in addressing him. Ms. Wren's complaint was processed by the Union, but at some point Union representatives apparently decided to try to mediate a settlement of the issues between the two parties without involving the company. However, because Mr. Clark had filed his complaint with the Labor Relations department at Chrysler, a voluntary resolution negotiated by the Union was not possible.

Chrysler's (former) Director of Labor Relations, Keith Worthy, supervised the investigation into Mr. Clark's complaint by the company's Corporate Diversity Team. Director Worthy met with Ms. Wren to discuss Mr. Clark's complaint, though Ms. Wren maintains that no one from Labor Relations of the Union ever spoke to her about Mr. Clark's allegations. Union steward Steve Brooks corroborates Worthy's account of the meeting since he participated in it at Ms. Wren's request. During that meeting, Mr. Worthy informed Ms. Wren and Steward Brooks that he had concluded that Ms. Wren had violated Chrysler Standards of Conduct #8 (harassment and using vulgar, inappropriate language in the workplace) and #1 (providing the Company false and/or misleading information). Chrysler was authorized to discipline employees for such infractions, which sanctions could include terminating the offender's employment. Mr. Worthy announced at the meeting that he intended to take such action.

Almost immediately following the meeting, Mr. Morgan renewed discussions with Mr. Worthy on Ms. Wren's behalf to request further investigation by the Company, but Mr. Worthy declined to stay his decision. Mr. Worthy stated that besides the difficulties Ms. Wren had had with Mr. Clark, he had additional concerns about Ms. Wren's negative attitude based on information he had received from other tool crib employees, all of which substantiated Mr. Clark's allegations. On February 17, 2010, the Company issued a Notice of Suspension,

Disciplinary Layoff or Discharge to Ms. Wren, indicating that she was being indefinitely suspended for violating Chrysler's Standards of Conduct Nos. 1 and 8.

Mr. Worthy continued his investigation of Mr. Clark's allegations, conducting interviews with Ms. Fording and Mr. Jarrett. Mr. Jarrett, an African American male, corroborated reports that Ms. Wren had thrown things and engaged in unseemly, uncontrolled outbursts of foul language, adding that he had heard her on more than one occasion describe herself as "the average n****r in the woodpile."

Mr. Morgan and Mr. Worthy met a third time, when Mr. Morgan further pled Ms. Wren's cause by proposing a nine-day, rather than indefinite, suspension, based on the fact that there were no eye witnesses to the incident between Ms. Wren and Mr. Clark. Having failed to convince Mr. Worthy to reinstate Ms. Wren, Mr. Morgan filed a grievance (the Suspension Grievance) on Ms. Wren's behalf, alleging that she had been unjustly suspended. The Company denied the Union Grievance at Steps 1 and 2.[3] When Union President Thomas Boruff conducted the Step 3 review of the merits of the Grievance, which included discussions of the facts with Morgan and—on June 1, 2010—with Wren herself, Boruff determined that the Suspension Grievance should be withdrawn, based on insufficiency of the evidence. On September 20, 2010, President Boruff wrote to Ms. Wren advising her that the Suspension Grievance had been withdrawn—a letter she acknowledges receiving.

Ms. Wren returned to work following her suspension. She and Clark did not work directly together, and there were no other interactions between them until February 2011. At that time, due to employee reductions in the tool crib workforce and other job position realignments

---

[3]   The five step grievance policy for union members is set out in detail in Exhibit J to the Union's brief.

by the Company, Chrysler planned to transfer Clark to the third shift, which would have required him to work again with Wren in the tool crib.  Various meetings were held by Company supervisors and union representatives to discuss the difficulties of putting these two employees back together in the workplace.  A private meeting was held among Company and Union supervisors with Ms. Wren and Mr. Clark, at which Mr. Morgan explained to Ms. Wren and Mr. Clark that, based on the Company's past practice, Chrysler planned to remove them both from the tool crib if either or both indicated they could not work together.  Mr. Clark responded that he would make an effort to be civil and work with Ms. Wren on the same shift, but Ms. Wren indicated that she could not work with Mr. Clark in the tool crib on the same shift because she feared for her safety and did not want to "look over her shoulder." Because Ms. Wren said that she could not work with Mr. Clark, Mr. Worthy decided to move both employees to other work sites. Ms. Wren was transferred to Department 6200 and Mr. Clark was transferred to Inspection.

Ms. Wren remained unhappy and filed an objection to her transfer, believing that only Mr. Clark should have been moved since her seniority rights outranked his.  Accordingly, the Union filed another grievance (the Transfer Grievance) on Wren's behalf, challenging her transfer and alleging that her seniority rights had been violated.  The Transfer Grievance proceeded to Step 3, following Chrysler's denials at Steps 1 and 2, and again, after review and further investigation, Union President Boruff concluded that the Company's decision to transfer both employees was consistent with past practice, was reasonable under the circumstances, and was unsupported by sufficient evidence as well as contractual support to succeed on the Transfer Grievance.  After discussing the matter further with Mr. Morgan, President Boruff withdrew the Grievance.  On July 11, 2011, in a letter to Ms. Wren, Boruff advised her that the grievance filed on her behalf was being withdrawn, signaling that no further action would be taken on this

matter. Ms. Wren acknowledges that she received this letter and understood shortly after it was sent that the Union was taking no further action on the Transfer Grievance.

Based on her transfer, Ms. Wren suffered no loss in contractual benefits or pay or any other detriment to her seniority rights and overtime eligibility. In fact, she testified that as a result of this change in her workplace assignment, her transfer to the second shift made for a less stressful environment for her than she had experienced when on the third shift, and that she was happy to be away from Mr. Clark.

A separate episode of workplace conflict involving Ms. Wren arose in October 2011 relating to certain alleged indiscretions by her fellow employee, Tammy McGuinness, whose behaviors Ms. Wren had found offensive.[4] Ms. McGuinness, a Caucasian woman, was Ms. Wren's "team leader" as of October 2011. According to Ms. Wren, Ms. McGuinness allowed a male fellow employee to fondle her (McGuinness's) breasts over her clothes on one occasion at work. Ms. Wren asserts that Ms. McGuinness also showed male co-workers pictures of her breasts that were stored on her cell phone. Ms. Wren claims that she viewed this behavior as disrespectful and demeaning. She recalls telling her Union steward about Ms. McGuinness's indiscretions, and maintains that this behavior should have been reported, though she concedes that Ms. McGuinness, who was also a member of the Union, was beyond the purview of Union discipline, since this dispute involved two Union members. Ms. Wren never requested that the Union file a grievance regarding Ms. McGuinness's conduct. She claims that after she made these complaints about Ms. McGuiness's behavior, Ms. McGuinness began to "harass" her, criticize her, and subject her to unwarranted disciplinary actions.

---

[4] The parties do not appear to agree on the spelling of McGuinness's name. We adopt the spelling used in the Complaint.

Under Article 33 of the UAW Constitution, a member has the right, at a membership meeting, to challenge the actions of the Local Union or its officials, in a wide range of areas, including grievance handling. Other sources of information and assistance are available to members about their rights to challenge Union actions with which they disagree. Wren apparently attended such a Local Union membership meeting on or about September 17, 2011, to challenge the Local Union's withdrawal of the Suspension Grievance and the Transfer Grievance and to request reinstatement of those grievances. The membership denied her request to reinstate the Suspension Grievance, and made no further effort to challenge the withdrawal of her Transfer Grievance. Thereafter, Ms. Wren took no further internal action to appeal the withdrawals of either grievance by the union.

Wren filed her EEOC charge on July 17, 2012, and her Complaint on January 7, 2013.

## Legal Analysis

### Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all

facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

## Discussion

Plaintiff brings ten Title VII claims, alleging that Chrysler and the Union were each responsible for discriminating against her on the basis of race and sex, harassment on the basis of race and sex, and retaliation.[5] We reach the merits of these claims with respect to only a small number of Plaintiff's factual allegations, because the preponderance of her allegations are time-barred.

## I.     Plaintiff's Time-Barred Allegations

The limitations provision of Title VII provides that a plaintiff must file a complaint with the Equal Employment Opportunity Commission (EEOC) "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).[6] Any action not filed within this time period is time-barred and cannot be brought in court. *Chaudhry v. Nucor Steel-Ind.*, 546 F.3d 832, 836 (7th Cir. 2008). An employment practice triggering the 300-day EEOC filing clock is a "discrete

---

[5] Plaintiff's Complaint also refers vaguely to claims under Section 301 of the National Labor Relations Act, though no such claims are asserted in any of the Complaint's ten counts. In her Response, Plaintiff acknowledges that she has abandoned any NLRA claim she might have initially intended to assert. *See* Pl.'s Resp. 13 n. 7.
[6] Indiana is a "deferral" state, and thus the 300-day time limit applies rather than the 180-day limit mentioned elsewhere in the same provision. *See* 42 U.S.C. § 2000e-5(e)(1).

act or single occurrence that takes place at a particular point in time." *Id.* (citations omitted).

Ordinarily, a plaintiff thus must file an EEOC complaint within 300 days of an employer action

violating the statute, even if that discrete act or single occurrence "has a connection to other acts"

also committed by the employer later in time. *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S.

101, 111 (2002); *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO, Local 790 v. Robbins

& Myers, Inc.*, 429 U.S. 229, 234 (1976).

　　As Plaintiff points out, the "continuing violation" doctrine operates in some instances to

preserve the timeliness of certain violations which, if considered in isolation, would otherwise be

time-barred. "A continuing violation is one that could not reasonably have been expected to be

made the subject of a lawsuit when it first occurred because its character as a violation did not

become clear until it was repeated during the limitations period." *Dasgupta v. Univ. of Wisc. Bd.

of Regents,* 121 F.3d 1138, 1139 (7th Cir. 1997). Under this theory, courts treat a qualifying

combination of acts "as one continuous act that ends within the limitations period." *Speer v.

Rand McNally & Co.*, 123 F.3d 658, 663 (7th Cir. 1997) (quoting *Selan v. Kiley,* 969 F.2d 560,

564 (7th Cir. 1992)). A continuing violation may apply to "covert" discrimination, in which the

plaintiff alleges that "the employer has, for a period of time, followed a practice of

discrimination, but has done so covertly, rather than by way of an open notorious policy." *Id.*

The doctrine may also apply to allegations of a hostile work environment. "Hostile environment

claims are different in kind from discrete acts. Their very nature involves repeated conduct . . .

The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It

occurs over a series of days or perhaps years and . . . a single act of harassment may not be

actionable on its own." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115; *Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 21 (1993). Provided that an act contributing to the hostile-environment harassment

occurred within the filing period, the entire time period of the hostile environment may be considered by a court for purposes of determining liability. *Nat'l R.R. Passenger Corp.*, 526 U.S. at 117.

Plaintiff's invocation of continuing violation doctrine is almost entirely inapposite here, however. Plaintiff filed her EEOC charge on July 17, 2012; therefore only conduct occurring on or after September 21, 2011, or conduct that was part of a continuing violation that extended past that date, can give rise to a viable Title VII claim. *See* Chrysler Ex. A (Gilliland Aff.) at ¶ 6. The two employer actions constituting the bulk of Plaintiff's grievances against Chrysler—her February 2010 suspension and her February 2011 transfer away from the tool crib—both occurred well before that cut-off date. Pl.'s Resp. 12, 15. The Union filed grievances in response to both actions, but both were also terminated well before September 2011. The Union withdrew the suspension grievance on September 2, 2010, and Wren has conceded that she received notice shortly thereafter that the Union would not take any further action with respect to the suspension. *See* Boruff Decl. ¶¶ 23–24; Boruff Decl. Exs. E, F; Wren Dep. 113, 208–210.[7] The Union withdrew the transfer grievance on July 11, 2011, and informed Wren in writing that it was doing so; she acknowledges that she knew of the withdrawal within "days." Boruff Decl. ¶ 29; Boruff Decl. Ex. H; Wren Dep. 149, 224–225.

_____

[7] Wren states in her deposition that she once again raised the issue of her suspension grievance at a Union meeting on September 17, 2011—approximately a year after she received notice that the Union had withdrawn the grievance. Wren Dep. 113–116. Neither in her Complaint nor her response brief, however, does Plaintiff claim that the Union's failure to reopen a long-closed grievance in September 2011 constituted a discriminatory act or practice. Wren never accounts for her year-long delay in raising the issue, nor does she contend that any new developments intervened between September 2010 and September 2011 influencing the validity of the Union's decision not to pursue the grievance further. *See Metz v. Tootsie Roll,* 715 F.2d 299, 304 (7th Cir. 1983) ("At some point . . . the appellant should have realized that the Union was taking no action on her behalf. The appellant cannot be allowed to sit back and claim a lack of notice in light of circumstances such as these.").

The 2010 suspension and the 2011 transfer were both overt, discrete acts undertaken by Chrysler; because those employment actions were complete before September 2011, Title VII claims against Chrysler stemming from them are time-barred. *See Dasgupta,* 121 F.3d at 1139–1140 (denying a continuing violation claim where "[plaintiff's] failure to bring such a suit cannot be ascribed to the ambiguous or incomplete nature of the discrimination—to his being the victim of a campaign whose discriminatory character was not apparent at the time").[8] Plaintiff's claims against the Union are also time-barred, because they accrued when she knew, or should have known, that the Union was taking no further action in the grievance process related to those two adverse actions. *See Metz v. Tootsie Roll,* 715 F.2d 299, 304 (7th Cir. 1983).

Some of the misconduct recounted by Plaintiff did, at least ostensibly, occur after September 21, 2011. This includes Plaintiff's allegations that Clark was "always coming around" even after her transfer, that McGuinness allowed male co-workers to touch her breasts in Plaintiff's presence, and that McGuinness subsequently mistreated her in retaliation for her complaints about McGuinness's workplace misconduct. We now address these residual allegations in light of the standards governing racial and sexual disparate treatment, racial and sexual harassment, and retaliation. Ultimately, we conclude that there are no genuine issues of material fact warranting the survival of any of Plaintiff's claims.

## II.    Disparate Treatment

In order to withstand summary judgment on a Title VII claim for disparate treatment on the basis of race or sex, "the plaintiff one way or the other must present evidence showing that . .

---

[8] Wren's deposition testimony included discussion of a 2000 EEOC discrimination charge she filed against the Union. Wren Dep. 243–247. However, Plaintiff does not argue that any of the Union's conduct—still less any conduct post-dating September 2011—constituted impermissible retaliation for this earlier complaint. *See* Pl.'s Resp. 14–15.

. a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any non-invidious reason." *Hester v. Ind. State Dep't of Health*, 726 F.3d 942, 946 (7th Cir. 2013). Federal courts have described two pathways by which a claimant may meet this burden: the direct method and the indirect method. A plaintiff can prevail under the direct method "by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 726 (7th Cir. 2008) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)) (further citations omitted).

A plaintiff may prove discrimination "indirectly" via the burden-shifting method first set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, a plaintiff first bears the burden of setting forth a *prima facie* case for discrimination, which she may satisfy by showing that: "(1) [s]he is a member of a protected class, (2) [s]he met h[er] employer's legitimate job expectations, (3) [s]he suffered an adverse employment action, and (4) similarly situated employees outside of the protected class received more favorable treatment." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013) (quoting *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012)). If the plaintiff crosses this threshold, then the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer does so, the burden shifts back to the plaintiff to present evidence that, if believed by the trier of fact, would show that the real explanation for the action is discrimination. *Morgan*, 724 F.3d at 996.

We do not reach the merits of Plaintiff's sex and race discrimination claims because none of her allegations of discriminatory conduct against either Chrysler or the Union relate to events

occurring after September 21, 2011. In her consolidated response to the summary judgment motions, Plaintiff argues only that the 2010 suspension constituted discriminatory treatment: "Chrysler applied its expectations to similarly-situated employees Clark and Wren in a way that was decidedly more favorable to Clark, the African American male, than to Wren, the Caucasian female." Pl.'s Resp. 10–11. None of the other misconduct Plaintiff allegedly endured on or after September 21, 2011 qualified as an adverse employment action, and none bore any relation to the 2010 suspension.

Plaintiff alleges that, even after the February 2011 transfer (and potentially lasting until past September 2011), Clark "was always coming around" in Wren's employment area, and that this upset her. Wren Dep. 37. She alleges that she transferred from the third to the first shift to try to get away from Clark, but that even after this shift change she continued to "have problems" with him. *Id.* at 35, 44. As an initial matter, Plaintiff's own deposition testimony contradicts her characterization of the seriousness of these continued problems with Clark.[9] Under cross-examination, she conceded that Clark never used abusive language towards her after her two reported run-ins with him, nor did he engage in any kind of physical or verbal harassment. *Id.* at 169. In fact, she never spoke to Clark at all after the February 2010 "dolly incident." *Id.* Rather, her grievance appears to be that Clark would occasionally be present in her work area or in the employees' common break room; despite the lack of any specific interactions with him, she maintains that this bothered and upset her. Regardless of the exact nature of her difficulties with Clark, Plaintiff has offered no evidence that Chrysler's or the Union's response to them was discriminatory. She relates that when she told supervisor Dave Rail on one occasion that Clark's

---

[9] The only evidence Plaintiff has designated in opposition to the motions for summary judgment is her deposition testimony.

presence in the break room was bothering her, Rail approached Clark and Clark left the room. Wren Dep. 45. When she complained of Clark's presence on another occasion to Union steward Ryan Morgan, Morgan responded that Clark was not doing anything wrong by being in the break room. *Id.* In the absence of any evidence that Clark was violating company policy by sitting in the employees' break room or walking through Wren's department, we cannot conclude that Chrysler's failure to discipline him for doing so was an adverse employment action against Wren—or that it continued any pattern of discrimination against Wren relating back to her suspension. *See Speer,* 123 F.3d at 663–664 (noting that a continuing violation claim cannot be sustained without an "anchor allegation" of wrongful conduct within the limitations period); *Hill v. Am. Gen. Fin., Inc.*, 218 F.3d 639, 645 (7th Cir. 2000) (discussing the scope of an "adverse employment action" as including "when an employee is fired or demoted, suffers a decrease in benefits or pay, or is given a significantly lesser job"). Similarly, any claim against the Union for disparate treatment fails in the absence of an allegation that the company violated the applicable collective bargaining agreement within the limitations period. *See Greenslade v. Chicago Sun-Times,* 112 F.3d 853, 866 (7th Cir. 1997).

We accordingly GRANT Defendants' motions for summary judgment with respect to: Count I for sex discrimination (disparate treatment) against Chrysler, Count II for sex discrimination (disparate treatment) against the Union, Count V for race discrimination (disparate treatment) against Chrysler, and Count VI for race discrimination (disparate treatment) against the Union.

## III. Hostile Work Environment

Plaintiff's Complaint asserts four counts of hostile environment race and sex harassment against both Chrysler and the Union, but Plaintiff has abandoned those claims.

Both the Union and Chrysler, in addition to contending that the hostile work environment allegations are time-barred, argue in their opening summary judgment briefs that such claims fail on the merits. *See* Union Br. 31–33; Chrysler Br. 12–16. In her response brief, Plaintiff argues broadly that her harassment claims—together with all her other claims—are not time-barred. Pl.'s Resp. 8–9 (Chrysler claims); 13–15 (Union claims). She does not, however, address Defendants' arguments on the merits, and she never mentions the elements of a *prima facie* hostile environment claim at all.[10] Although she reiterates her allegation that she continued to "have problems" with Clark in the course of arguing that the Union discriminated against her in connection with her February 2011 transfer, she never argues, implicitly or explicitly, that these unspecified "problems" with Clark were "sufficiently severe or pervasive to alter the conditions of [her] employment." Pl.'s Resp. 17. *Cf. Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986) (cited in Union Br. 31).[11] By failing entirely to offer a response to Defendants' asserted grounds for summary judgment on the hostile environment theory of liability, Plaintiff has waived any arguments she may have—and has thus abandoned the claims. *Central States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999); *Perry v. City of Indianapolis,* 2013 WL 1750747, at *7 (S.D. Ind. Apr. 23, 2013).

We accordingly GRANT Defendants' motions for summary judgment with respect to: Count III for sex discrimination (hostile work environment) against Chrysler, Count IV for sex discrimination (hostile work environment) against the Union, Count VII for race discrimination

---

[10] The heading for the section of the Complaint addressing Plaintiff's claims against the Union does state: "The Union Discriminated Against Wren, *Subjected Her to Harassment on the Basis of Both Sex and Race*, and Retaliated Against Her." Pl.'s Resp. 13 (emphasis added). The discussion that follows, however, mentions only disparate treatment discrimination, and it concerns only the Union's handling of its representation of Plaintiff in connection with her suspension and transfer grievances.

[11] Nor does Plaintiff establish that any ostensible "harassing" conduct by Clark occurred within the limitations period, other than to assert generally that she continued to work in Department 6200 until 2013.

(hostile work environment) against Chrysler, and Count VIII for race discrimination (hostile work environment) against the Union.

## IV.    Retaliation

Plaintiff alleges that Chrysler impermissibly retaliated against her for reporting what she reasonably believed to be Clark's harassment of her. Pl.'s Resp. 11–13.[12]

Title VII prohibits an employer from discriminating against an employee for opposing a practice made unlawful by the Act. 42 U.S.C. § 2000e-3(a). To prove a case of retaliation, a plaintiff must show that: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action at the hands of her employer; and (3) there was a causal link between the two." *Fine v. Ryan Int'l Airlines,* 305 F.3d 746, 752 (7th Cir. 2002); *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1457 (7th Cir. 1994).

Here, Plaintiff's encounters with Clark, her resulting complaints, and Chrysler's decision to transfer both employees all occurred outside the limitations period. *See supra,* § I.[13] As we have already stated, the suspension and transfer were discrete acts, and Plaintiff has offered no

---

[12] Plaintiff's Complaint alleges that the Union also retaliated against her by "subjecting her to unwarranted disciplinary actions, and by reassigning her in violation of the CBA." Compl. ¶ 62. In its summary judgment brief, the Union argues that summary judgment on the Union retaliation claim is warranted because "there is no evidence that Chrysler violated the collective bargaining agreement or that the Local Union breached its duty [of] fair representation." Union Br. 30 (citing *Greenslade,* 112 F.3d at 866). The allegations with respect to the Union's handling of the suspension and transfer grievances are time-barred, *see supra* § I, and Plaintiff has waived any retaliation claim against the Union based on other conduct falling within the limitations period by failing to point to any further instance in which the collective bargaining agreement was allegedly breached or the Union allegedly breached its duty of fair representation. *See Central States, Se. & Sw. Areas Pension Fund v. Midwest Motor Exp., Inc.,* 181 F.3d 799, 808 (7th Cir. 1999); *Perry v. City of Indianapolis,* 2013 WL 1750747, at *7 (S.D. Ind. Apr. 23, 2013). Although she states that "both company and union officials" heard her complaints about Clark's presence in the break room and other areas, Pl.'s Resp. 17, Plaintiff never asserts that the company's response breached the CBA or that the Union failed to redress any such breach.

[13] Even if allegations that the transfer was retaliatory were not time-barred, it does not appear that the transfer would constitute an "adverse employment action" under applicable Seventh Circuit precedent. "[A] lateral transfer without a loss in benefits does not constitute an adverse employment action." *Stutler v. Ill. Dep't of Corr.,* 263 F.3d 698, 702 (7th Cir. 2001).

evidence that the discriminatory or retaliatory character she attaches to them was unapparent at the time and was only revealed after September 2011; indeed, she pursued grievances with the Union at the time in response to both acts. *See Speer,* 123 F.3d at 664 ("It is undisputed that Speer was aware of the nature of Raymond's alleged acts as they occurred. It is also undisputed that Speer complained . . . long before the limitations period expired. Raymond's alleged conduct was open, not covert . . . ."). Plaintiff avers that she was "emotionally upset by the transfer," that Clark was assigned to the same shift as Wren (until she requested, and received, a shift change), and that she "continued to have problems" with Clark even after the shift change. Pl.'s Resp. 12–13. Plaintiff at least implies that these consequences of the transfer continued through the limitations period. Even if they did, however, that fact does not save her retaliation claim: "The EEOC charging period is triggered when a discrete unlawful act takes place . . . [but] current effects alone cannot breathe life into prior, uncharged discrimination." *Chaudhry,* 546 F.3d at 836.

In order for Plaintiff's retaliation claim to withstand summary judgment, she must therefore point to "at least one viable charge within the appropriate limitations period"— evidence of a discrete retaliatory act or conduct that represents a continuation of an earlier retaliatory pattern. *See Speer,* 123 F.3d at 663 (quoting *EEOC v. Harvey L. Walner & Assocs.*, 91 F.3d 963, 969 (7th Cir. 1996)). Plaintiff complains of only a few instances of employer conduct that could potentially meet this definition. The first relates to the company's response to what Wren considered to be continued harassment by Clark; she alleges that "[a]lthough Wren documented each time Clark was in her area, and reported it to both company and union officials, no one appeared to do anything about it, since the behavior continued unabated." Pl.'s Resp. 13 (citing Plaintiff's Statement of Additional Facts in Dispute at ¶¶ 21–23). Second,

Plaintiff alleges that the company failed to take action when she complained of McGuinness's behavior with co-workers—and that McGuinness, who was a "team leader," proceeded to mistreat Plaintiff thereafter. *Id.*

None of these allegations give rise to a viable retaliation claim, because none of them describe an "adverse action" suffered by Plaintiff at Chrysler's hands. *Cf. Fine,* 305 F.3d at 752. While adverse action is defined more broadly in the context of retaliation than it is in the context of a discrimination claim, *see Vance v. Ball State Univ.*, 646 F.4d 461, 473 (7th Cir. 2011), the misconduct alleged still must be serious enough that it would "discourage other employees from complaining about employer conduct that violates Title VII." *See Huri v. Circuit Court of Cook Cnty.*, 2012 WL 1431268, at *4 (N.D. Ill. Apr. 25, 2012). "An adverse action occurs when an employee is fired or demoted, suffers a decrease in benefits or pay, or is given a significantly lesser job. Not every unwelcome employment action qualifies . . . . Negative reviews, a change in job title, . . . or a lateral transfer do not, by themselves, qualify." *Hill*, 218 F.3d at 645. *See also Harper v. C.R. England, Inc.*, 2011 WL 3421490, at *8 (N.D. Ind. Aug. 3, 2011) (noting that "not everything that makes an employee unhappy is an actionable adverse action") (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)). The Seventh Circuit has held that retaliatory harassment by co-workers or supervisors can rise to the level of a materially adverse action, but only if it is severe enough to cause a "significant change in the plaintiff's employment status." *Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001).

Here, as we have already noted, Plaintiff's complaints of "continued problems" with Clark after her job transfer are ill-defined. She has stated that she felt intimidated by his presence in employee common areas like the break room and the occasions in which he walked through her work area. According to Plaintiff, she made notes of times in which Clark was present—

though the two never spoke or had any physical interaction—and raised the issue with both company and Union representatives, to no avail. Wren Dep. 35, 37, 44, 46. As for McGuinness, Plaintiff asserts that, after she complained of McGuinness's sexual behavior with co-workers, McGuinness retaliated by engaging in "verbal harassment" and "did anything she could to get [Plaintiff] in trouble with [her] supervisor." *Id.* at 69, 70–71. Plaintiff has provided no evidence of any concrete job-related consequences that she suffered at the hands of McGuinness or any other company figure, however, and her deposition testimony—the only evidence which Plaintiff designates—is vague. Her colloquy with defense counsel on the issue was as follows:

Q: Can you describe what the verbal harassment was?

A: Where do you want me to start? The verbal harassment was the language. How she treated me. *How she treated everybody.* With Richard, I can't think of his last name, he's on the washer, Tammy [McGuinness] – I asked Tammy why Richard didn't come to the team meeting. Tammy told me, she said, "you don't need to know why he didn't come to the team meeting. If you need to know what's going on with him, you need to talk to management."

She walked over to Richard. Next thing I know, Richard comes to my position on Position 59, and he yelled at me and got on me. And I – "Keep my name out of my" – "out of your mouth. And don't you even talk to me. Don't you even worry about what I'm doing." And I'm just, like, "Wow."

And so, I reported that to the supervisor. And I don't know his name, William something, at that time.

But whatever Tammy had told him, he was very hostile toward me.

Q: Okay.

A: And I reported that to William.

Q: Any other incidents?

A: Just her saying she didn't have to have respect for anybody.

Q: She said that before you complained, though, didn't she?

A: Yeah. She just – *she wasn't very respectful to anyone.*

Q: She was not respectful before you complained and she was not respectful after you complained?

A: Yes. And she just never had anything nice to say. And several times I told her, "You know, Tammy, I don't want to hear it. If you don't have anything nice to say, don't say anything at all, because I don't want to hear it. What part of that don't you understand?"

Q: Is that a problem that you had both before and after your complaint?

A: Yes.

. . .

Q: Any other ways in which you regarded Tammy as harassing you?

A: No. Just any chance she could to get me in trouble, she – like I said, with William, the line – the line got behind because Tammy was supposed to be covering me, and she didn't cover me. And then when William came over, I got in trouble.

. . .

Q: Did you feel like the entire time that Tammy was your team leader, that she criticized you and got you in trouble for things?

A: Yeah.

Q: Okay.

A: She's just not a very nice person.

Q: Okay. It says here in this complaint that she constantly criticized you and subjected you to unwarranted disciplinary actions. Did you ever get disciplined during the time that Ms. McGinnis [sic] was your team leader?

A: No, I just got verbal warnings.

Wren Dep. 71–74 (emphasis added).

Read in the light most generous to Wren, these allegations state merely that Clark's presence in work areas was uncomfortable and upsetting to her, and that McGuinness was an unpleasant coworker—and further, that McGuinness caused her to get into (unspecified) "trouble" on at least one occasion, and that she caused her to receive verbal warnings from other supervisors. By Plaintiff's own admission, McGuinness's general nastiness predated Plaintiff's complaint about the fondling incident, and McGuinness was uncivil to her and other coworkers alike. *Id.* at 71:6; 72:6–9. *Cf. Holman v. Indiana,* 211 F.3d 399, 403 (7th Cir. 2000) (noting that "Title VII does not cover the 'equal opportunity' . . . harasser"). Even if it was indeed targeted at

Plaintiff in retaliation for Plaintiff's complaints, McGuinness's conduct, like Clark's continued presence in the workplace, falls considerably short of causing a "significant change" in Plaintiff's employment status. *See, e.g., Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (holding that job reassignment and being assigned uncomfortable job tasks "constitute mere temporary inconveniences and do not rise to the level of an adverse employment action"); *Bell v. EPA,* 232 F.3d 546, 554–555 (7th Cir. 2000) (holding that "numerous incidents of alleged retaliation, including demeaning assignments, verbal abuse, surveillance, diminished responsibilities, refusal to cooperate on job assignments, and placements in situations designed to result in failure," even in the aggregate, "do not rise to the level of actionable retaliation").

We accordingly GRANT Defendants' motions for summary judgment with respect to Count IX for retaliation against Chrysler, and Count X for retaliation against the Union.

### Conclusion

The majority of Plaintiff's allegations against Chrysler and the Union—including those involving her 2010 suspension and 2011 job transfer—are time-barred and cannot give rise to a valid Title VII claim. The remaining allegations do not set forth a *prima facie* case for disparate treatment or retaliation, and Plaintiff has waived claims arising from a hostile work environment theory. We accordingly GRANT Defendants' motions for summary judgment in their entirety and will cause judgment to enter in Defendants' favor.

IT IS SO ORDERED.


03/26/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

23

Distribution:

Jay  Meisenhelder
EMPLOYMENT AND CIVIL RIGHTS LEGAL SERVICES
jaym@ecrls.com

Amanda L. Shelby
FAEGRE BAKER DANIELS LLP - Indianapolis
amanda.shelby@faegrebd.com

Ellen E. Boshkoff
FAEGRE BAKER DANIELS LLP - Indianapolis
ellen.boshkoff@faegrebd.com

Robert Adam Hicks
MACEY SWANSON & ALLMAN
rhicks@maceylaw.com

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com